IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 13, 2017

## STATE OF TENNESSEE v. JOHN DAVID ALTENHOFF

**Appeal from the Circuit Court for Sequatchie County**
**No. 2015CR56        J. Curtis Smith, Judge**

_____

### No. M2017-00052-CCA-R3-CD

_____

John David Altenhoff, the Defendant, pled guilty to voluntary manslaughter and agreed to an eight-year sentence with the manner of service to be determined by the trial court. After finding that the Defendant had an extensive history of criminal behavior, that society needed to be protected from the Defendant, and that measures less than incarceration had unsuccessfully been applied to the Defendant, the trial court ordered the Defendant to serve his sentence in the Department of Correction. On appeal, the Defendant argues that the trial court erred in denying an alternative sentence. After a thorough review of the facts and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT H. MONTGOMERY, JR., JJ., joined.

B. Jeffery Harmon, Jasper, Tennessee, for the appellant, John David Altenhoff.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Mike Taylor, District Attorney General; and Steve Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural History

On June 2, 2015, the Sequatchie County Grand Jury indicted the Defendant for second degree murder. On May 23, 2016, the Defendant entered a best interest plea to

voluntary manslaughter and agreed to an eight-year sentence as a Range II multiple offender. The Defendant agreed that the trial court would determine the manner of service at a later hearing. At the Defendant's guilty plea submission hearing, the State offered a recitation of facts in support of the Defendant's plea.

At the sentencing hearing, the Defendant testified that he had serious medical problems at birth and wore a colostomy bag until he was approximately fifteen months old; after surgery, he continued to wear diapers until he was in the ninth grade. The Defendant stated that he was an ironworker until he fell fifteen feet and broke both bones in his right leg. He also testified that he obtained a scar on his head from a home invasion in 2011, where he was beaten and shot. The Defendant stated that he had been diagnosed with "post[-]traumatic stress disorder, severe social anxiety, and depression." He explained that he had received counseling and was prescribed medication while incarcerated, but the medication made him feel like a "zombie" and he could not afford to pay for it out of pocket, so he no longer took the medication. The Defendant stated that he had used drugs since he was twelve years old and had "never received any treatment or help for it." He explained that, due to his digestive problems, he needs to eat five or six small meals a day, so he smokes marijuana on a daily basis to help increase his appetite and relieve his anxiety.

The Defendant testified that he was born addicted to crack cocaine and that both of his parents used drugs in front of him when he was a child. In 1999, at the age of nineteen, the Defendant pled guilty to two counts of sale and two counts of possession of cocaine and received a probated sentence, but he violated the terms of his probation by failing a drug screen and was incarcerated. In 2000, the Defendant threw a socket wrench at an individual in another vehicle; he later pled guilty to throwing a deadly missile and received a two-year sentence. In 2004, the Defendant pled guilty to burglary, grand theft, and cocaine possession and received a five-year probated sentence. The Defendant violated the terms of his probation and was incarcerated. In 2005, the Defendant moved from Florida to Tennessee to live with his mother because he "knew that if [he] stayed in Florida [he] would get in trouble again and they have three strikes and you're out law, plus the re-offender act, so [he] would have probably received a life sentence . . . ." After he moved, the Defendant worked for Stone Source, a tile installation company. The Defendant stated that he had performed stone work for three different employers during the last ten years and that he "was never fired from any of them."

The Defendant stated that he had two sons, ages seven and eight, who lived with their mother. He stated that he had visitation with the children "every weekend or any time that [he] can." The Defendant testified that, if he received an alternative sentence, he could easily become employed as a stoneworker. He explained that:

- 2 -

[t]he only other thing [he would] be eligible for and what [he] would really like to do is become a youth . . . drug counselor for adolescent teens that . . . have drug addicted parents like [he] did, because if somebody had helped [him] when [he] was a teenager [he] wouldn't be sitting here right now.

Regarding the events underlying the offense, the Defendant testified that, approximately five weeks before the offense, Melody Norris contacted him on Facebook and stated that "she was breaking up with her boyfriend, she thought [the Defendant] was cute and wanted to hook up, so it went from there." However, Ms. Norris continued to see her former boyfriend, the victim. The Defendant stated that, approximately five days before the offense, he told the victim that he wanted to end his relationship with Ms. Norris. He stated that he was not angry with the victim and that they smoked marijuana together. Three days prior to the offense, the Defendant asked Ms. Norris to move out of his residence, and he asked the victim to pick up Ms. Norris, which the victim did. However, on the night of the offense, Ms. Norris "called [the Defendant] hysterical claiming that [the victim] was going to kill her, that he was going crazy saying that she put cameras and listening devices in the phone, . . . and would [the Defendant] please come get her." Initially, the Defendant told Ms. Norris that he could not come get her because he did not have a car. After Ms. Norris called the Defendant a second time, he was able to get a ride with Kathy Bonner.

The Defendant explained that he had never been to the victim's house before and that, when his phone died, he stopped at a gas station to ask for directions. The Defendant arrived at the victim's residence at approximately 2 a.m. The Defendant called Ms. Norris, who stated that she was gathering her belongings and would meet him outside. After waiting on Ms. Norris to come outside for ten to fifteen minutes, the Defendant attempted to call her again. Ms. Bonner said that she heard someone screaming, and the Defendant got out of the vehicle. The Defendant testified that he "look[ed] around the backside of the trailer where [the screams were] coming from and [the victim] was on top of [Ms. Norris] hitting her and [the Defendant] told him, . . . 'Hey, Dude, why don't you just stop hitting her and come hit on me.'" The Defendant stated that the victim grabbed a five- or six-foot pole that looked like a piece of electrical conduit[1] and began swinging it while stating that he was going to kill the Defendant and that Ms. Norris was not going to leave. The Defendant backed up and told the victim that he had a knife as the victim continued approaching Ms. Bonner's vehicle and eventually hit the car with the pole as Ms. Bonner started driving off. The Defendant stated that he

---

[1] The Defendant later acknowledged that the pole that looked like "electrical conduit" was actually a plastic-coated aluminum broomstick handle. However, he stated that he was unaware that it was plastic-coated aluminum during the offense.

attempted to pursue Ms. Bonner's vehicle while Ms. Norris attempted to grab her bags and evade the victim. At this point, the victim's father had also exited the victim's residence. The Defendant again warned the victim to not come any closer because he had a knife. The Defendant said that the victim's father stated that he was going to get a gun and went back into the victim's residence. The Defendant told Ms. Norris to run, but the victim "hit her and she fell down." The Defendant "charged towards [the victim] and [the victim] kind [of] stepped back a little bit and it was enough to get [Ms. Norris] up, so [the Defendant] snatched her towards the car and when she was getting in the car [the victim] went to swing the pole at [the Defendant]." As the victim swung the pole, the Defendant "duck[ed] down" and "stabbed [the victim] one time[;] [the victim] fell down on the ground, [but] he got back up and ran towards his house so [the Defendant] figured he was okay, and [the Defendant] left."

After the Defendant got into Ms. Bonner's vehicle, he observed that Ms. Norris, who had also gotten into the vehicle, had "some marks on her[,] [h]er kne[e] was scraped up, and she got some blood on the backseat of [Ms. Bonner]'s car . . . ." The Defendant explained that he did not wait for police to arrive because he believed the victim was not seriously injured and because the victim's father had threatened to go get a gun. As the Defendant, Ms. Bonner, and Ms. Norris drove away, the victim's sister called the Defendant to inform him that the victim had died. The Defendant returned to Soddy Daisy, where he smoked marijuana and ingested some methamphetamine. He stated that another individual, Timothy Brian, later disposed of the knife used to stab the victim. The Defendant was arrested at approximately 7:30 a.m.

After making bond, the Defendant returned to work laying tile. He admitted that he had used drugs since he made bond. The presentence report indicates that the Defendant informed the presentence report writer that "he did not want to waste [the report writer's] time or anyone else's time [and] that he didn't want probation[,] he just wanted to go serve his time." The Defendant explained that he had been aggravated because the presentence report writer had called to reschedule the appointment to fill out the presentence report, and the Defendant did not have a ride to the appointment. He also stated that he knew the only way that he could overcome his drug addiction was by detoxing during incarceration. The Defendant testified that he was "trying to get into [a] drug treatment program[,]" that he "applied to Teen Challenge[,] and [that he] was going to apply to the Foundry in Alabama also." The Defendant stated that he chose to apply for the Teen Challenge program because "after you complete the one-year program they offer some type of help with training to become a drug counselor, and . . . that's what [he] was wanting to do." The Defendant explained that he chose to apply for a year-long program because he wanted to "get [his] life straight[]" and to stop using drugs. The Defendant stated that he pled guilty because he felt responsible for the loss of the

victim's life.  The Defendant informed the victim's family that he was sorry for the victim's death.

On cross-examination, the Defendant explained that he had used marijuana and methamphetamine while out on bond.  The Defendant admitted that he had used marijuana on the day of the offense, but he stated that he had not used methamphetamine. The Defendant stated that he was not high when he committed the offense and agreed that his drug use did not influence his behavior that night.  The Defendant stated that he was not violent unless he was provoked.  The Defendant denied telling police that he realized the victim's pole was plastic when he stabbed the victim.  He asserted that he told police that, if he had known the pole was plastic, he would not have stabbed the victim, and he "would have just beat [the victim] with [his] hands."  The Defendant agreed that he did not call 911 after he left the victim's residence.  The Defendant stated that he had never attended a drug treatment program because he "tried to get help and [he] was never offered it."  He explained that he "went to New Horizons and asked for help and they told [him] that cocaine was something that [he] could stop using any time [he] wanted to, so they couldn't admit [him]."  The Defendant stated that he attended religious services prior to making bond and that he was still attending church.  The Defendant also admitted that he used methamphetamine prior to making bond when "one time . . . methamphetamine c[a]me in the jail here and everybody in the pod used it."

Diane Cubilla testified that she had known the Defendant for five or six years. She explained that she was friends with the mother of the Defendant's children and that she observed the Defendant frequently spend time with his children.  She stated that the Defendant had "a very good relationship with his sons."  Ms. Cubilla stated that, when the Defendant talked about the offense, he cried and was remorseful.  On cross-examination, Ms. Cubilla testified that she was aware that the Defendant had "a history with drugs[]" but did not know that he was currently using drugs.  She stated that the Defendant had the capacity to act violently when provoked, but she had "not witnessed it."

In its written order filed on November 29, 2016, the trial court found that "[t]he [D]efendant ha[d] a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[,]" noting his "extensive" criminal activity.  The trial court gave this factor "heavy weight[.]"  The trial court also found that "[t]he [D]efendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[]" because his probation had previously been revoked.  The trial court gave this factor "moderate weight[.]"  The trial court found that no mitigating factors applied to the Defendant's case.  The trial court noted that, because the Defendant was a Range II multiple offender, he was not

considered a favorable candidate for an alternative sentence. In determining that the Defendant should serve his sentence in confinement, the trial court stated the following:

> The [trial] [c]ourt did not find the Defendant a credible witness [but that he] is an individual who possesses very little self-control which has resulted in lifelong criminal activity. His testimony did not establish any justification for actions leading up to the stabbing death of [the victim] . [The] Defendant's long history of illegal activity and poor judgment do not establish him as a good candidate for probation. Society should be protected from an individual such as Defendant. He is undeserving of an alternative sentence and shall serve his eight (8) year sentence in the Tennessee Department of Correction.

The Defendant timely appealed the trial court's denial of alternative sentencing.

## II. Analysis

On appeal, the Defendant argues that the trial court abused its discretion in its denial of alternative sentencing because the Defendant expressed remorse and acted in his own defense and out of provocation. The State asserts that the trial court properly denied alternative sentencing to the Defendant because "[t]he record supports the trial court's findings and demonstrates that the trial court acted consistently with the purposes and principles of sentencing."

### Standard of Review

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after "a proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "[A]n appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2015), Sentencing Comm'n Cmts. To facilitate meaningful appellate review of a felony sentence, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2015); *Bise*, 380 S.W.3d at 706.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made on the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2015); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103(5) (2015).

*Manner of Service*

The abuse of discretion with a presumption of reasonableness standard of review set by our supreme court in *Bise* also applies to a trial court's decision to grant or deny probation. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (citing *Bise*, 380 S.W. 3d at 708). Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" Tenn. Code Ann. § 40-35-102(6) (2015).

Tennessee Code Annotated section 40-35-303 states that:

[a] defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less; however, no defendant shall be eligible for probation under this chapter if convicted of a violation of § 39-13-304, § 39-13-402, § 39-13-504, § 39-13-532, § 39-15-402, § 39-17-417(b) or (i), § 39-17-1003, § 39-17-1004 or § 39-17-1005. A defendant shall also be eligible for probation pursuant to § 40-36-106(e)(3).

Tenn. Code Ann. § 40-35-303(a) (2015). A defendant has the burden of establishing that he is suitable for probation and demonstrating that probation will "subserve the ends of justice and the best interest of both the public and the defendant." *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

When considering whether to order full probation, the trial court may consider "the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes." *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996) (citing Tenn. Code Ann. §§ 40-35-210(b)(4), -103(5), -103(1)(B)).

If a trial court denies probation, under Tennessee Code Annotated section 40-35-103, the trial court should look to the following considerations to determine whether a sentence of confinement is appropriate:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1) (2015).

Here, the trial court found two enhancement factors applicable to the Defendant: that the Defendant had a long history of criminal behavior, which the trial court gave heavy weight, and that measures less than incarceration had been unsuccessful for the Defendant, which the trial court gave moderate weight. The trial court also found that the Defendant was not a credible witness and that "[h]is testimony did not establish any justification for actions" leading up to the offense. The trial court denied an alternative sentence because of the "Defendant's long history of illegal activity and poor judgment" and because society needed to be protected from the Defendant. Because the trial court identified on the record reasons consistent with the purposes and principles of sentencing for denying probation, we afford the trial court's decision a presumption of reasonableness. *See Caudle*, 388 S.W.3d at 278-79; *see also State v. Kyto Sihapanya*, No. W2012-00716-SC-R11-CD, 2014 WL 2466054, at *2-3 (Tenn. Apr. 30, 2014).

The Defendant points to *State v. Biggs*, 482 S.W. 3d 923 (Tenn. Crim. App. 2015) and *State v. Tammy Marie Harbison*, No. M2015-01059-CCA-R3-CD, 2016 WL 613907, at *4-6 (Tenn. Crim. App. Feb. 12, 2016), *no perm. app. filed*, to support his contention that the trial court abused its discretion by ordering confinement. The Defendant also

argues that "his case facts fi[t] squarely with[in] the [*State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000)] rationale[]" because "split-second actions in defense of himself when being attacked and in defending another were the result of provocation and sudden passion." However, the holdings of these cases do not apply to cases, like the current one, where the trial court denied probation based on multiple factors. Because these cases are factually different from the case at hand, we decline to apply their reasoning to the Defendant's case. We conclude that the trial court did not abuse its discretion by ordering the Defendant to serve his sentence in confinement. The record supports the trial court's findings that the Defendant had a long criminal history and was unable to successfully complete alternative sentences in the past. The Defendant is not entitled to relief.

### III. Conclusion

Based on the aforementioned reasons, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE